IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS

UNITED STATES OF AMERICA                                                    PLAINTIFF

V.                                    NO. 4:04CR00229 JLH

DEBORAH EDWARDS and                                                      DEFENDANTS
NATHANIEL J. JENNINGS

PROPOSED FINDINGS AND RECOMMENDATIONS

**INSTRUCTIONS**

The following recommendation has been sent to United States District Court Judge

J. Leon Holmes.  Any party may serve and file written objections to this recommendation.

Objections should be specific and should include the factual or legal basis for the objection.

If the objection is to a factual finding, specifically identify that finding and the evidence that

supports your objection.  An original and two copies of your objections must be received

in the office of the United States District Court Clerk no later than eleven (11) days from

the date of the findings and recommendations.  The copy will be furnished to the opposing

party.   Failure to file timely objections may result in waiver of the right to appeal questions

of fact.

If you are objecting to the recommendation and also desire to submit new, different,

or additional evidence, and to have a hearing for this purpose before the District Judge,

you must, at the same time that you file your written objections, include the following:

1.      Why the record made before the Magistrate Judge is inadequate.

2.      Why the evidence proffered at the hearing before the District
        Judge  (if such a  hearing is granted)  was not  offered at  the
        hearing before the Magistrate Judge.

3.      The detail of any testimony desired to be introduced at the
        hearing before the District Judge in the form of an offer of

proof, and a copy, or the original, of any documentary or
other non-testimonial evidence desired to be introduced at
the hearing before the District Judge.

From this submission, the District Judge will determine the necessity for an additional

evidentiary hearing, either before the Magistrate Judge or before the District Judge.

Mail your objections and "Statement of Necessity" to:

Clerk, United States District Court
Eastern District of Arkansas
600 West Capitol Avenue, Suite 402
Little Rock, AR 72201-3325

## **RECOMMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This case involves a traffic stop on U.S. Interstate 40 near Russellville, Arkansas,

on January 24, 2004, which resulted in a search and discovery of one kilo of cocaine,

digital scales and a number of ziplock bags.   Defendants Nathaniel J. Jennings and

Deborah Edwards, respectively the driver and occupant of the vehicle, have filed motions

to suppress the search results and to suppress a statement given two days later by

Defendant Jennings.[1]  The United States has responded.[2]  The motions were referred for

recommended disposition, and I have held a hearing.   The parties filed briefs after the

hearing,[3] and the motions are ready for disposition.

---

[1]Defendant Edwards' motion is docket entry #53.  Defendant Jennings' motion is docket
entry #49.  An earlier motion was denied without prejudice, with the requirement that more specific
motions be filed (docket entry #48).

[2]Docket entries #50 & #59.

[3]I ordered simultaneous briefs with both sides being allowed to file reply briefs.  Defendant
Jennings' initial memorandum brief is docket entry #66.  Defendants' joint memorandum brief
regarding the search results is docket entry #68.  The United States' initial brief is docket entry #67.
The reply briefs are docket entries #70 and #71.

Defendants argue that the stop and subsequent events violated their rights under the Fourth Amendment to be secure against unreasonable searches and seizures. To determine the issues presented, the Court must determine whether the initial stop was lawful; if so, whether the circumstances supported a reasonable, articulable suspicion on the part of the officer that they were carrying contraband; and, if not, whether Defendants' consent to the search was sufficient to purge the taint of an unlawful detention. Defendant Jennings also asserts that his statement, taken two days later, violated his Fifth Amendment rights because it was not voluntary.

Basic Background Facts

On Saturday, January 24, 2004, at 4:00 p.m., Arkansas State Police Sergeant Kyle Drown was traveling eastbound on U.S. Interstate 40 near Russellville. He worked with the canine unit and had just returned from a medical call in the northwestern part of the county. His shift ended at 4:00 p.m., and he was headed home. It was raining. He saw Defendants' vehicle, a gold Chevrolet Trailblazer, which was also traveling eastbound in the outside lane, briefly cross the "fog-line"[4] onto the right shoulder. He pulled the vehicle over. He recorded the entire stop with a fixed video camera, which includes audio, as he was wearing a microphone.[5] The video camera was not turned on until after Defendants' vehicle had crossed the line and thus does not show the violation. Drown approached on the passenger's side for safety reasons and told the occupants, both of whom are African

---

[4]The white stripe that delineates where the shoulder begins.

[5]A more detailed description of the events shown by the videotape follows this section. Of course, the video is the best evidence of the events and the District Judge will want to view it in considering my recommendations. The description is to aid in reviewing the tape and to relate specific language that was used.

American, that they crossed the line and he just wanted to make sure the driver was not drinking.  He asked the driver, Defendant Jennings, a male, for his license and registration. Defendant Edwards, a female, said the vehicle was rented.  Drown obtained Jennings' Tennessee driver's license, the rental agreement, Edwards' Arkansas driver's license and a California identification card she had.  He asked Defendant Jennings to accompany him back to the patrol car while he ran the NCIC checks.  Defendant Edwards remained in the Blazer.  As he ran the checks, Drown asked Jennings if he was drinking and why he had crossed the fog-line, asking if it was because of the rain.  Jennings started to say it was the rain, but then said he had been distracted because Edwards was pointing out she had grown up in the area and he had looked away from the road.  As Drown was waiting for the records check, he asked Jennings about tickets and prior arrests, with Jennings responding that he had prior speeding tickets.  Drown asked where they had been and other details of the trip.  On being told they had been to Los Angeles, Drown asked how long they had been there and what the purpose of the trip was.  Jennings responded that they had stayed out there all week, Edwards was visiting family, and he was just along for the ride.  Jennings said they had stopped in Las Vegas on the way back.  They talked about the fact that Jennings, who then lived in Tennessee, had once lived in Little Rock .  Drown asked about when they left Little Rock, when they left California, and where they had stopped on the way back.  Drown remarked that Defendant Jennings was yawning a lot and discussed the fact that he was tired.  The checks on both Defendants came back negative.  At about nine and one-half minutes from the stop, Jennings asked if he was going to get a ticket and Drown replied that he was getting a warning.  Drown then went back to the Blazer and asked Defendant Edwards essentially the same questions about

4

the trip he had asked Jennings. Drown told her Jennings was awfully tired and that she should drive. They discussed relatives in the Russellville area and Drown asked about where the pair had stayed on the way back. A fair characterization is that Defendants' answers were basically consistent. Drown then returned to his patrol car and Edwards walked around the Blazer and sat in the driver's seat. Drown asked Jennings additional questions about where they had stopped on the way back and told Jennings he was getting a warning, but Edwards should drive. As will be discussed below, up to this point, Drown had stayed completely within the bounds of an appropriate traffic stop. However, immediately after telling Jennings he was only getting a warning, he asked if there was anything illegal in the car such as weapons, drugs or large amounts of cash. When Jennings said no, Drown asked if he had any problem with his searching Jennings' belongings and the car, and Jennings said no. Drown then went back to the Blazer, told Edwards that Jennings was acting nervous and asked her whether there was anything illegal in the car. She said no and he asked for her consent to a search, to which she agreed. As to both Defendants, Drown asked about the consent twice. The search revealed the items which are the subject of the suppression motion. After finding the cocaine package, Drown placed Defendants under arrest by cuffing them and read them the *Miranda*[6] rights. Defendant Edwards stated that she had been given the package by a friend named Jose, who asked her to deliver it to his Aunt Juanita. She said she assumed it was Mexican food. Drown attempted to get Defendant Edwards to cooperate in a delivery of the cocaine, but she demurred, saying she would need to talk to her

---

[6] *Miranda v. Arizona*, 384 U.S. 436 (1966).

5

attorney about that.   Two days later, while Jennings was still in custody, Agent Anthony Lemons, in the presence of Sgt. Drown, read Jennings the *Miranda* warnings and took the statement from him.

The Videotape

The videotape[7] reveals, in pertinent part, the following:

Defendants' vehicle pulled off the interstate to the right and came to a complete stop at 16:01:02.  Sgt. Drown approached their vehicle from the passenger side, away from traffic.  He asked for the driver's license and said he wanted to make sure he hadn't been drinking as they went over the white line "back there."  He asked for the vehicle registration, and Defendant Edwards responded that it was a rental car and that they rented it in Little Rock.  Drown obtained both occupants' licenses and documentation and asked Defendant Edwards if she was Deborah.  Then he asked Defendant Jennings, who was the driver, to go back to the police car to sit while Drown checked the records.  As they entered the car, a dog was barking in the background.  Although there was no testimony regarding this, it sounds as if the dog was in the back of the police car.[8]  Drown asked Defendant Jennings if he had anything to drink, to which Jennings said no.  Drown then asked if there was any reason he went over on the shoulder, saying, "Was it the rain?"  Jennings started to say it was the rain and then corrected himself to say in effect that he was looking away and distracted because Edwards was telling him she was from Russellville.  Drown was obviously looking at the identification he had been given as he then made the remark that

---

[7]Gov't Ex. 2.

[8]Although the original motion to suppress mentions a "dog sniff," the tape reveals that there was none.  Defendants do argue that the presence of the dog was intimidating.

Edwards "looks terribly different" in one picture than in the other.[9]  Drown then asked about tickets and prior arrests and called in on his radio for a check on Jennings.  While waiting for the response, he asked Jennings about where they had been and what was going on in California.  Jennings replied that they were visiting Edwards' family and that he had just gone along for the ride.  He said he and Defendant Edwards were friends and that he used to live in Little Rock near Geyer Springs, saying he lived in Little Rock about seven months.  He then said he lived around Chicot-Baseline.  This took place while Drown was waiting for information.  The tape is not clear, but it appears that Drown's contact radioed there was nothing adverse on Defendant Jennings.[10]  Drown then asked his contact for information on Defendant Edwards.  Drown asked Jennings again about Edwards' family in California.  He then asked, "How long did you all get to stay out there?"  Jennings responded, "We stayed out there all week."  Drown then questioned, "A whole week?"  Jennings said yes.[11]  He also said they had stopped in Las Vegas.  Drown next asked when they left to go out there (to California).  Jennings said it was last Sunday he thought.  At this point, Drown received negative responses on the radio as to both Defendants.  He then remarked that Defendant Jennings was yawning a lot and asked if he was tired.  Jennings said not really but then agreed he was, saying he had not made a long trip like that before.  Drown asked when they had left California, and Jennings responded that they had left Thursday he thought, Thursday or Friday late in the evening.  There was further

---

[9]It should be noted that Drown did not testify that he found that suspicious, and the license and ID were not offered in evidence.

[10]No contention is made that anything learned about either Defendant would have led to suspicion about their activities.

[11]The conversation about the length of stay starts at approximately 16:07:29 on the tape.

conversation about yawning, and Drown said, "You are yawning about every other breath." Drown was apparently writing during this conversation.  Jennings talked about the fact that they had to get back.  At 16:10:32 on the tape, Jennings asked if he was getting a ticket and Drown replied, "This is a warning."  This was about nine and one-half minutes into the stop.  Drown then said, "Let me go up there and explain that to her and I'll be back here in just a second."  He then proceeded to Defendants' vehicle and told Defendant Edwards that Jennings was yawning a lot and they might want to swap drivers.  He then asked how long they had stayed out in California and she replied, "Oh, about a week this time, and we stopped at Vegas; he hadn't seen Vegas before."  Drown asked how they were related and she said they were just friends.  He asked again, "Y'all got to stay out in California about a week?"  She responded yes and Drown said that was not a bad drive.  He then asked if the purpose was a vacation and about her family out there.  Her answers were consistent with what Defendant Jennings had told Drown.  They then discussed her relatives in Russellville and people they knew there.  They discussed her school.  He remarked on the fact that the pictures on her IDs  did not look alike, and asked about when they were taken. She responded that they were taken about two years apart.  He then asked about where they stayed, and she said they stayed in Clarksville and said they left California Friday. Drown then returned to the patrol car, where Jennings was waiting, and Edwards walked around the Blazer to the driver's side.  Drown told Jennings that Edwards was going to drive since all he had done was yawn.  Drown asked again when they left and whether they had stopped.   Jennings said they had stopped but was very unclear about where. However, his answers really were not inconsistent with what Defendant Edwards had told Drown.  Drown then told Jennings he was getting a warning, but that he seemed awful tired

and that was why she needed to drive.   The tape showed the time as 16:15:15.

Immediately after, Drown asked if they had anything illegal in the car such as knives or

guns or drugs, to which Defendant Jennings responded no.  Drown also asked about large

amounts of currency and Jennings said he had no money, that he had lost in Las Vegas

and they joked about that being a reason he did not need to go back.   Drown then said,

"So you don't have anything illegal?"   Jennings said no and Drown said, "Would you have

a problem with me searching your belongings and searching the vehicle?"   Jennings said

no.  This was at 16:15:53 on the tape.   In response to questions about contents, he said

they had some lemons.[12]  Drown asked again if it would be all right to search, and Jennings

said yes.   Drown then had him exit the patrol car and stand outside while he went to their

vehicle.  The dog again barked as they were exiting.  Drown then told Defendant Edwards

that Jennings was acting real nervous and that he did not even remember where they

stopped at a motel and that Jennings gave him permission to search the vehicle and his

belongings, "cause he's acting real nervous."  Drown then asked Edwards, "You don't know

of anything illegal in here, do you?"   She said no and Drown asked, "Do you have a

problem with me searching the vehicle and your belongings?"   She said no, and he

confirmed that she was saying he could search.  This occurred at approximately 16:17:16

on the tape.  She also said that if there was anything wrong in the vehicle it wouldn't belong

to either of them.  Drown then searched the vehicle, finding the cocaine brick.  He placed

both Defendants under arrest approximately twenty-seven minutes after the initial stop.

---

[12]At least one reported case discussed the fact that citrus fruits are sometimes carried to mask the scent of narcotics, but Drown did not mention this in his testimony as arousing his suspicion.

He informed Defendant Edwards of her *Miranda* rights and questioned her.  She said that the package was given to her by a friend named Jose and that he asked her to take it to his Aunt Juanita.  She was unwilling to participate in any delivery without talking to her lawyer.

The Initial Stop

As an initial matter, it is clear that a traffic stop is a "seizure" under the Fourth Amendment, and that the principles of *Terry v.* Ohio, 392 U.S. 1 (1968), are applicable. *United States v. Fuse,* 391 F.3d 924, 927 (8th Cir. 2004), *cert. denied*, 125 S. Ct. 1879 (2005).  However, it is well settled in the Eighth Circuit that any traffic violation, however minor, creates probable cause to stop the driver of the vehicle.  *Id.*; *United States v. Gregory*, 302 F.3d 805, 809 (8th Cir. 2002), *cert. denied*, 538 U.S. 992 (2003); *United States v. Barahona*, 990 F.2d 412, 416 (8th Cir. 1993).  The subjective motive of the officer is irrelevant.  *United States v. Long*, 320 F.3d 795, 798 (8th Cir. 2003).

Defendants nevertheless argue that the initial stop violated the Fourth Amendment.  First, they say the United States has not proved that Defendants' vehicle crossed the fog-line.  Next, they argue that even if it did, that does not constitute a traffic violation under the applicable Arkansas statute and the stop was pretextual.  Although the video recorder was not turned on until after the violation occurred,[13] Sgt. Drown testified that the Blazer did drift over the line.  The tape shows that when asked about the reason he drifted over, Defendant Jennings did not deny he had done so.  I find Drown's testimony credible and find that the vehicle did cross the line.

---

[13]This is hardly suspicious in light of the fact that an officer cannot be expected to anticipate a violation.

Defendants' second contention is answered by *United States v. Pulliam*, 265 F.3d 736 (8th Cir. 2001), which involved the same statutory provision.[14]  The statute reads in part, "[a] vehicle shall be driven as nearly as practicable entirely within a single lane...."  Defendants suggest that under the statute, an inadvertent crossing of a line, perhaps caused by weather, does not violate the statute.  The Court in *Pulliam* said that where the defendant had made no contention that he needed to move out of his lane to avoid something in the road, there was a violation.  This case is the same in that Defendants have likewise made no such contention.  Jennings simply said he took his eyes off the road.  The *Pulliam* Court said that, "even under a strict construction, [the officer] had [the defendant] dead to rights for a traffic violation." *Id.* at 739.   In *Pulliam*, the line had been crossed twice in two miles, but any argument that crossing the line briefly only once renders the stop invalid is foreclosed by *United States v. Herrara-Martinez*, 354 F.3d 932 (8th Cir. 2004) (under South Dakota statute containing the same operative language as that of the Arkansas statute, legality of stop upheld where the officer observed no traffic violations other than a single fog-line crossing).

Sgt. Drown was justified in stopping Defendants' vehicle.  No constitutional violation arises out of the initial stop in this case.

Expanding the Detention

The next issue is whether Drown unconstitutionally extended the detention after he announced that he was giving a warning only, but then continued to detain Defendants,

---

[14]Ark. Code Ann. § 27-51-302.

asking whether there was anything illegal in the vehicle and if they had a problem with his searching their belongings and the vehicle.  This issue is much more troublesome.

As part of a routine traffic stop, it is clear that an officer can conduct an investigation reasonably related in scope to the circumstances that justified the stop.  *United States v. McCoy*, 200 F.3d 582, 584 (8th Cir. 2000).  Although at least one commentator has argued that scope should be more strictly limited,[15] courts are pretty much in agreement that a reasonable investigation includes continuing the detention while the officer is checking license and registration, checking for outstanding warrants and criminal history, asking the occupants routine questions about their destination and the purpose of their trip, and doing the necessary paperwork to write a citation or warning.  *Fuse,* 391 F.3d at 927; *United States v. $404,905.00 in U.S. Currency*, 182 F.3d 643, 647 (8th Cir. 1999).

However, when the officer has completed the initial stop, any further detention must be supported by "a reasonably articulable suspicion for believing" that other criminal activity is occurring.  *Fuse*, 391 F. 3d at 927, and cases cited therein.  District Judge Mark Bennett, sitting by designation in *United States v. Beck*, 140 F.3d 1129 (8th Cir. 1998) (suppressing search results), set forth an excellent overview of the law:

> Because the purposes of Officer Taylor's initial traffic stop of Beck had been completed by this point, Officer Taylor could not subsequently detain Beck unless events that transpired during the traffic stop gave rise to reasonable suspicion to justify Officer Taylor's renewed detention of Beck. *See* [*United States v.*] *Mesa*, 62 F.3d [159,]162 [(6th Cir. 1995)].  Thus, we must consider whether Officer Taylor had a reasonable, articulable suspicion that Beck's Buick was carrying contraband or that other criminal activity may have been afoot.  *Terry*, 392 U.S. at 30; *United States v. Johnson*, 64 F.3d 1120, 1124 (8th Cir.1995); *[United States v.] Ramos*, 42 F.3d [1160,] 1163

---

[15]Wayne R. LaFave, *The "Routine Traffic Stop" from Start to Finish: Too Much "Routine and Not Enough Fourth Amendment*, 102 Mich. L. Rev. 1843 (2004)

[(8th Cir. 1994)]; [*United States v.] White*, 42 F.3d [456,] 460 [(8th Cir. 1994)]. "'Whether the particular facts known to the officer amount to an objective and particularized basis for a reasonable suspicion of criminal activity is determined in light of the totality of the circumstances.'" *United States v. Halls*, 40 F.3d 275, 276 (8th Cir.1994) (quoting [*United States v.] Garcia*, 23 F.3d [1331,] 1334 [(8th Cir. 1994)]); see also *United States v. Pereira-Munoz*, 59 F.3d 788, 791 (8th Cir.1995) (holding that reasonable suspicion is determined in the totality of the circumstances); [*United States v.] Bloomfield*, 40 F.3d [910,] 918 [(8th Cir. 1994)] (holding that reasonable suspicion is determined in light of the totality of the circumstances).

This court has summarized the standards used to consider whether reasonable suspicion exists as follows:

> The standard of articulable justification required by the fourth amendment for an investigative, *Terry*-type seizure is whether the police officers were aware of "particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant[ed] suspicion that a crime [was] being committed." *United States v. Martin*, 706 F.2d 263, 265 (8th Cir.1983); see also *Terry*, 392 U.S. at 20-21. In assessing whether the requisite degree of suspicion exists, we must determine whether the facts collectively establish reasonable suspicion, not whether each particular fact establishes reasonable suspicion. "[T]he totality of the circumstances--the whole picture--must be taken into account." *United States v. Cortez*, 449 U.S. 411, 417 (1981). We may consider any added meaning certain conduct might suggest to experienced officers trained in the arts of observation and crime detection and acquainted with operating modes of criminals. *See United States v. Wallraff*, 705 F.2d 980, 988 (8th Cir.1983). It is not necessary that the behavior on which reasonable suspicion is grounded be susceptible only to an interpretation of guilt, *id.*; however, the officers must be acting on facts directly relating to the suspect or the suspect's conduct and not just on a "hunch" or on circumstances which "describe a very broad category of predominantly innocent travelers." *Reid v. Georgia*, 448 U.S. [438,] 440-41 [(1980)]; *United States v. Sokolow*, 831 F.2d 1413 (9th Cir.1987), [rev'd on other grounds, 490 U.S. 1 (1989)].

*United States v. Campbell*, 843 F.2d 1089, 1093 (8th Cir.1988); see also *United States v. Green*, 52 F.3d 194, 198 (8th Cir.1995); [*United States v.] Dawdy*, 46 F.3d [1427,] 1427 [(8th Cir. 1995)]; *Bloomfield*, 40 F.3d 910, 919

& n.10.  In *United States v. Sokolow*, 490 U.S. 1 (1989), the Supreme Court observed that factors consistent with innocent travel can, when taken together, give rise to reasonable suspicion. *Sokolow*, 490 U.S. at 10; see *United States v. Hoosman*, 62 F.3d 1080, 1081 (8th Cir.1995); *Bloomfield*, 40 F.3d at 918; *United States v. Weaver*, 966 F.2d 391, 394 (8th Cir. 1992).

*Beck*, 140 F.3d at 1136-37 (parallel citations and subsequent case history omitted)

Sgt. Drown was justified in his actions of checking licenses, asking for the rental agreement, and asking routine questions while awaiting information.  He was justified in asking the occupants about the duration and purpose of their trip.  Certainly the questions about where Defendants had rested had a bearing on whether Defendant Jennings was too fatigued to drive and were reasonably related to the initial stop.  However, after Drown had completed this process and announced he was issuing a warning, he went further, keeping Defendants detained while asking about contraband in the vehicle and asking whether Defendants had a problem with his searching their belongings and the vehicle.  To impose that additional detention, rather than allowing them to go on their way, required that he have a reasonable, articulable suspicion that the Blazer was carrying contraband or that other criminal activity was afoot.

When asked at the hearing, Drown referred to Defendant Jennings' nervousness, to "inconsistencies" in general and to the inconsistency between what Defendants told him about the duration of their stay in California and the duration of the vehicle rental period.  He also referred to his training that quick trips to and from locations is part of what officers should look for as a suspicious circumstance.

Other than the rental agreement length, which will be discussed below, there are really no suspicious or relevant inconsistencies in what Defendants separately told Drown.  In questioning and in the briefs, the United States points to the fact that Defendant

14

Edwards said they left California on Friday, whereas Jennings said on Thursday.  Actually, Jennings said Thursday or Friday and obviously was not sure.  The United States also puts forward the alleged discrepancy between Defendants' stories as to where they stopped to rest.  Again, the discrepancy is slight.  After a leading question, Jennings said Oklahoma or Arkansas.  He was somewhat vague, but was admittedly very tired.  On the whole, the stories were consistent.  One said they stopped at a "Super Eight" and the other said at a "Motel Eight."  The alleged discrepancy in what Jennings told Drown about where he had previously lived in Little Rock certainly does not give rise to a reasonable, articulable suspicion that there was contraband in Defendants' vehicle.  In the first place, as Defendants show, the streets or areas named are in close proximity and there was no glaring discrepancy, if indeed any.  Further, it is difficult to see how a misstatement as to where Jennings had lived for seven months at some earlier period could have any relationship at all to whether he was transporting contraband on the day in question.  The information was simply not relevant to that issue.  The type of discrepancy that gives rise to reasonable suspicion is the type that is relevant, such as where the two occupants tell different stories as to the purpose of their trips or as to their destinations, which is an indication that they are up to something else entirely.  For example, in *United States v. Lyton*, 161 F.3d 1168 (8th Cir. 1998), one occupant told the officer that they had been to Las Vegas to celebrate a birthday, but the other said they were going to stop in Las Vegas, but did not because they ran out of money.  In *United States v. Johnson*, 58 F.3d 356 (8th Cir. 1995), expansion of the stop was found justified where the husband said they had driven from Indiana to Las Vegas to gamble for one day and were returning to Indiana, but the wife first said they were coming from California, then said they were coming from

Laughlin, Nevada, where they had visited relatives for two or three days.   No such discrepancy exists here.   In fact, Defendants' explanations of the trip were basically consistent.   They were consistent on the overall time of the trip, on the fact that they went out to visit Defendant Edwards' relatives, that she had a number of relatives in California, that they drove pretty much straight through, and that they had stopped in Las Vegas on the way back and had stopped to rest not long before being pulled over.

The fact that the car was a rental is of no import.   This has been held not to be inherently suspicious.   *Beck*, 140 F.3d at 1137.   Nor is the fact that Sgt. Drown said he thought Defendant Jennings to be unduly nervous a telling factor.   Many persons stopped by police are nervous and it is very easy for officers to declare them nervous as a justification for their actions.   Alleged nervousness has been held to be of limited significance.   *Id.* at 1139.   Because the video camera was fixed, we cannot see Jennings' demeanor as could Drown, but as Defendants argue, Jennings did not sound unduly nervous.   The United States also points to the fact that Edwards tried to remove something from the car.   However, this was after the consent had been obtained and the search started.   It, like the fact that contraband was found, lends nothing to the question whether there was reasonable suspicion at the crucial time.   The United States also argues in its brief (although Drown made no mention of it) that California is a known drug source state.   As Defendants point out, this factor was discounted in *Beck*, 140 F.3d at 1137-38.   Many totally innocent people visit the state, which is heavily populated.   This adds little to the equation.

What we are left with is the alleged discrepancy between what Defendants told Drown about the length of their stay in California and the duration of the rental, along with

16

the fact that a long round trip with a short stay at the intermediate destination may be suspicious.  This was clearly the main basis Drown forwarded as giving rise to reasonable suspicion.  He said Defendants could not have been in California for a week because the rental agreement showed they could not have left for California earlier than the Sunday preceding the Saturday afternoon stop.  While that is certainly true, there are two problems with the conclusion that this circumstance gives rise to reasonable suspicion.  First, it is not clear that either Defendant was really saying they were in California for an entire week.  Drown asked Jennings if they were "out there" for a week.  "Out there" could have meant outside the state to Jennings.  Drown did ask Edwards how long they were in California, and she replied "about" a week and added that they had stopped in Las Vegas.  That too is subject to misunderstanding of the question.  Second, and more importantly, when Jennings was asked when they had left Arkansas, he said it was last Sunday.  That was consistent with the rental agreement and shows he had no intent to deceive about the overall length of the trip.  Drown did not ask Edwards when they had left Arkansas and specifically, when he went back to her to ask again about the length of their trip, he did not ask when they left Arkansas.  That question could have cleared up any uncertainty about whether she was lying about the duration of the trip.  Drown asked Jennings when they left Arkansas and got the truth.  He did not then ask Edwards.  One has to wonder why.

It is clear that the actual stay in California could have been no more than three days. It was a long trip for a short visit, which is a factor law enforcement officials deem an indication that the purpose of the trip was to pick up contraband for transport.  On the other hand, many totally innocent people make long trips to visit relatives and have a limited time with them because of business or other constraints.  Thus, this does not necessarily

indicate criminal activity by any means.  Is the fact that Defendants made an extremely long trip for a short visit in California enough, coupled with the equivocal situation regarding what Defendants said about the length of their stay and with Defendant Jennings' supposed nervousness, enough to establish a reasonable, articulable suspicion on the part of Drown that there was contraband in the car?  In close cases, reasonable persons can differ.[16]  However, it is my opinion that the circumstances in this case do not meet the mark.  I find that on the record in this case, the continued detention, with questions about contraband and the request for consent to search, violates the Fourth Amendment and case law.

Defendants make an argument that even if the continued detention were legal, the consents obtained were not voluntary, citing circumstances such as the fact that they were never told they were free to go, that the blue lights were left flashing, that there was a barking dog in the patrol car, that they were not advised they had the right to refuse consent, and that the way they were asked for consent was coercive.  It is not necessary to reach this question because of the finding that the continued detention was violative of the Fourth Amendment.  These are, however, factors that may be taken into account in determining whether the consent was sufficient to overcome the violation, as is discussed immediately below.

The Consent to Search

Even if the renewed detention was not justified, that does not end the case.  Both Defendants, in response to Drown's request, stated they would have no problem with his

---

[16]  See, for example, the concurrence in *Ramos*, 42 F.3d at 1164-1165 (Beam, J., concurring specially).

searching their belongings and the vehicle.  The United States cites *United States v. Menteer*, 350 F.3d 767 (8th Cir. 2003), for the proposition that the consent purged any Fourth Amendment violation that might have occurred.  However, the question is more complicated than it might appear upon reading *Menteer*.  *United States v. Yousif*, 308 F.3d 820 (8th Cir. 2002); *United States v. Moreno*, 280 F.3d 898 (8th Cir. 2002); and *United States v. Ramos*, 42 F.3d 1160 (8th Cir. 1994), each involved the situation presented here. That is, there was a stop or continued detention held to be a violation of the Fourth Amendment, followed by a consent to search.  These cases articulated the principles involved.  They refer to the holding of *Wong Sun v. United States*, 371 U.S. 471 (1963), that statements resulting from an illegal detention are not admissible and find that this rule would apply to physical evidence discovered during or as the result of an illegal detention. They go on to say, however, that it is possible for the causal chain between an illegal detention and evidence discovered afterwards to be broken by consent.  Analogizing this situation to *Wong Sun*  and *Brown v. Illinois*, 422 U.S. 590 (1975), the courts considered whether the consent was "sufficiently an act of free will to purge the primary taint."  *See Ramos*, 42 F.3d at 1164.  This is a higher standard than that necessary to find voluntary consent where there has been no preceding constitutional violation.  *Moreno* sets forth the analysis:

> The government must prove voluntariness of consent to search by a preponderance of the evidence. *See United States v. Matlock*, 415 U.S. 164, 177 (1974). Even if the initial stop is illegal, a court must decide if subsequent consent was, nevertheless, "sufficiently an act of free will to purge the primary taint." See *United States v. Ramos*, 42 F.3d 1160, 1164 (8th Cir.1994) (quoting *Wong Sun v. United States*, 371 U.S. 471 (1963)).

> In determining whether a confession retains the taint of an illegal seizure, the Supreme Court identified three factors the courts should consider: 1) the temporal proximity of the illegality and the confession; 2) the presence of intervening circumstances; and 3) the purpose and flagrancy of the official misconduct. *Brown v. Illinois*, 422 U.S. 590 (1975).  The same factors as identified by the United States Supreme Court in *Brown*, in determining whether a confession retains the taint of an illegal search are relevant in determining whether a voluntary consent to search retains the taint of an illegal stop or arrest. *United States v. Tovar*, 687 F.2d 1210, 1215 (8th Cir.1982).  "Voluntariness is a question of fact to be determined from all the circumstances," not just by focusing on a single statement made by the officer. *Schneckloth v. Bustamonte*, 412 U.S. 218, 231 (1973).

*Moreno*, 280 F.3d at 900 (parallel citations and subsequent case history omitted).

The first two factors militate against a finding that the consents were sufficient to overcome the illegality of the continued detention.  The requests for consent and consents immediately followed Drown's announcement that Jennings would get a warning.  There was no significant time interval.  There clearly were no intervening circumstances.

Further, the videotape clearly shows that Drown did not advise either Defendant of the right to refuse consent, to limit the scope of the search or to withdraw consent at any time.  This is a significant factor.  Admittedly, federal law does not require that the officer inform a suspect of those rights in order to gain a valid consent.[17]  However, in the context of determining whether the consent was "sufficiently an act of free will to purge the primary taint," the three cases cited above considered it important.  The Court in *Ramos*, in finding the consent sufficient, pointed out that the officer told the defendant both orally and in writing that he did not have to consent.  It acknowledged that such a warning is not

---

[17] *Schneckloth*, 412 U.S. at 231.  *See also United States v. Gosciniak*, No. 04-3008, 2005 WL 1421945 (8th Cir. June 20, 2005) (unpub. op.) (application of state case requiring officers to inform of right to refuse consent to search foreclosed by controlling federal cases construing the Fourth Amendment of the United States Constitution).

required; then said, "and so the fact that the officer gave it indicates rather strongly to us that he was not attempting to exploit an illegal situation." *Ramos*, 42 F.3d at 1164. *Moreno* also mentioned this factor in finding the consent sufficient to purge the taint of illegality. *Moreno*, 280 F.3d at 901. By contrast, in *Yousif*, the Court found the consent insufficient to purge the taint of the primary illegality. There the officer did not advise of the right to refuse and when the defendant's wife asked if they could search without a warrant, the officer replied that they could conduct a search if they were given consent or had probable cause. The Court found that language to be subject to the interpretation that the search would be conducted even without consent. *Yousif*, 308 F.3d at 831. I recognize that this case is not on all fours with *Yousif*. It falls somewhere on the continuum between *Ramos* and *Moreno* on the one hand and *Yousif* on the other. However, consideration of all three factors leads to the conclusion that the consents were not sufficient in this case.

The failure to give a full warning as to consent impacts the third aspect of the analysis. Sgt. Drown quickly seized on what he perceived as a discrepancy between what Defendants were telling him about the length of the stay in California and the rental agreement as a basis for extending the detention and asking permission to search. This was despite the fact that Jennings had honestly told him they left Arkansas the preceding Sunday and despite the fact that Drown never asked Defendant Edwards that same question. Drown then quickly asked about contraband and for permission to search, without telling either Defendant of the right to refuse. It appears Defendants had not been given back their documents and would not have reasonably understood they were free to leave. Under the totality of the circumstances, taking into account all the three factors, I am unable to conclude that the consent was sufficiently an act of free will to break the

21

chain of causation.  The coercive effect of the continued detention remained.  There is more than "but for" causation here.  The extended stop resulted in the search, and the consents were not sufficient to break the causal connection.

Defendant Jennings' Statement

On Monday, January 26. 2004, two days after the traffic stop, a Drug Enforcement Administration special agent, Anthony Lemons, interviewed Defendant Jennings at the Pope County Detention Center and took his statement.[18]  The agent first advised Jennings of his *Miranda* rights and had him execute a rights form.[19]  The agent wrote out the statement and Jennings signed it.  Sgt. Drown was present, but did not take part in taking the statement.  Under cross-examination, Lemons testified that he had a less than five-minute conversation with Jennings before executing the documents and that Jennings appeared to understand everything said to him.  He did not inquire into Jennings' education, but said he stated that he understood everything.  Lemons did not ask if Jennings could read and understand the English language, but did read the rights form to him.

First, it is clear from the videotape of the traffic stop that Jennings is fully capable of understanding English and was under no disability at that time.  He has advanced no evidence of any disability at the time the statement was taken.  He was fully advised of his rights prior to the statement, and the United States has carried its basic burden of showing the statement to be voluntary.

---

[18]Govt. Ex. 5.

[19]Govt. Ex. 4.

Further, the totality of circumstances shows that giving the statement was sufficiently an act of free will to purge any taint arising from the events of January 24, 2004. Each of the three factors mentioned above in the discussion of the consent to search favors the United States. The statement was removed in time from the search. There were intervening circumstances. The statement was taken by a different individual from a different agency, who explained Defendant Jennings' *Miranda* rights prior to taking the statement. The agent obtained Jennings' signature on the rights form. There is no evidence of bad faith. It cannot be said that the giving of the statement was the result of the initial search, in any sense other than "but for" causation. The statement should be admissible. *See United States v. Hernandez-Hernandez*, 384 F.3d 562 (8th Cir. 2004) (finding causal chain broken and later statement admissible, applying *Ramos, supra*).

Conclusion

I recommend that the motions to suppress the fruits of the search be granted and that the motion to suppress Defendant Jennings' statement be denied. Therefore, Defendant Edwards' motion (docket entry #53) should be granted and Defendant Jennings' motion (docket entry #49) should be granted as to the fruits of the search and denied as to his statement.

DATED this 9th day of August, 2005.

_____
UNITED STATES MAGISTRATE JUDGE